# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

March 28, 2026

By ECF

Honorable Andrew L. Carter Jr.
United States District Judge
Southern District of New York

**Re: United States v. Jason Ahmed, 26 Cr. 97 (ALC)**

Dear Judge Carter:

Pursuant to 18 U.S.C. § 3145(b), Jason Ahmed respectfully requests that the Court revoke his detention order and fix bail conditions. Mr. Ahmed is charged with one count of conspiracy to distribute narcotics under 21 U.S.C. §§ 846 and 841(b)(1)(A) and one count of firearm possession under 18 U.S.C. § 924(c). He was presented before Magistrate Judge Cave on March 17, 2026, and detained after a contested bail argument. A transcript of that proceeding is attached to this letter. Mr. Ahmed requests that this Court conduct *de novo* review of the prior bail decision and impose the following conditions: a $100,000 personal recognizance bond, cosigned by one financially responsible person and one person for moral suasion; home detention enforced by electronic monitoring; supervision as directed by Pretrial Services; travel restricted to SDNY/EDNY; surrender of passport and no new applications; prohibition on possession of firearms and/or ammunition; prohibition on contact with witnesses; and any other reasonable conditions the Court believes necessary.

*

In deciding whether to order Mr. Ahmed's pretrial release, the Court "should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984)). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Because the Bail Reform Act "generally favors bail release, the government carries a dual burden in seeking pre-trial detention."

Honorable Andrew L. Carter Jr.                                    March 28, 2026
United States District Judge                                      Page 2 of 3

Re:  United States v. Jason Ahmed
     26 Cr. 97 (ALC)


*United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). First, the government must prove by a preponderance of the evidence that Mr. Ahmed poses a risk of flight or prove by clear and convincing evidence that he is a danger to the community. Second, if the government makes such a showing, it must further show by the same quantum of proof that no conditions of release will reasonably assure his appearance or the safety of the community. *Id.* (risk of flight); § 3142(f)(2) (danger). These burdens remain even in cases involving a presumption of detention, like Mr. Ahmed's. *See, e.g.*, *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

"If a person is ordered detained by a magistrate judge, … the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." § 3145(b). A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). This means that "a district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *Id.*; *see also United States v. Esposito*, 309 F. Supp. 3d 24, 30 (S.D.N.Y. 2018) *(*citing *Leon).*

*

On *de novo* review, Mr. Ahmed, who is 25 years old and who is recommended for release by Pretrial Services, relies in the main on the arguments he advanced before Judge Cave. But one point warrants additional discussion here. Mr. Ahmed's partner and the mother of his child, Jayleen Jimenez—who was present in court and referenced at the initial bail hearing, *see, e.g.*, Tr. at 22–23—remains actively involved in his life and his case. She is very willing for Mr. Ahmed to be released to her residence and has assured counsel that she will carefully monitor him to ensure that he abides by all conditions of release, including home detention. Ms. Jimenez is also prepared to sign the bond for moral suasion along with an additional cosigner who would sign as a financially responsible person. *See, e.g.*, *United States v. Batista*, 163 F. Supp. 2d 222, 226 (E.D.N.Y. 2001) ("[A] defendant who presents

Honorable Andrew L. Carter Jr.                      March 28, 2026
United States District Judge                        Page 3 of 3

Re:  United States v. Jason Ahmed
     26 Cr. 97 (ALC)

some individuals with moral suasion and others who are financially responsible
may satisfy the requirements of bail.").[1]

*

For these reasons, and for the ones before Judge Cave, the Court should revoke
the detention order and set conditions of release.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

cc:  Georgia V. Kostopoulos, Esq.
     Assistant United States Attorney

---

[1] We are currently working to determine who the second consigner will be.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               26 Cr. 97 (ALC)

JASON AHMED, *et al.*,

                Defendants.

------------------------------x

                                             March 17, 2026

Before:

                    HON. SARAH L. CAVE,

                                        U.S. Magistrate Judge


                        APPEARANCES

JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:  GEORGIA V. KOSTOPOULOS
        Assistant United States Attorney


FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant Ahmed
BY: JONATHAN A. MARVINNY


COVINGTON & BURLING LLP
        Attorney for Defendant Dume
BY:  AMANDA K. KRAMER


ZEMAN & WOMBLE, LLP
        Attorney for Defendant Doyle
BY:  KENNETH WOMBLE

THE DEPUTY CLERK:  Your Honor, this is in the matter of United States v. Jason Ahmed, Eddie Dume, and Francheska Doyle, 26 Cr. 97.

Counsel, please state your appearance for the record.

MS. KOSTOPOULOS:  Good morning, your Honor -- or good afternoon, excuse me.  Georgia Kostopoulos for the government.

THE COURT:  Okay.  Good afternoon.

MR. MARVINNY:  Good afternoon, your Honor.  For Jason Ahmed, Jonathan Marvinny, Federal Defenders of New York.

THE COURT:  Okay.  Good afternoon.

MS. KRAMER:  Good afternoon, your Honor.  Amanda Kramer for Eddie Dume.

THE COURT:  Okay.  Good afternoon.

MR. WOMBLE:  Good afternoon, your Honor.  Ken Womble for Francheska Doyle.

THE COURT:  Good afternoon.

Good afternoon to you, Mr. Ahmed, Mr. Doyle, and Ms. -- sorry, Mr. Dume, and Ms. Doyle.  I am Magistrate Judge Cave.

May I have the date and time of arrest, please, Ms. Kostopoulos.

MS. KOSTOPOULOS:  Yes, your Honor.

All of the defendants were arrested this morning.  My understanding is that Mr. Dume was arrested at approximately 6:14 a.m., Mr. Ahmed was arrested at approximately 6:35 a.m.,

and Ms. Doyle I don't have the precise time, but between 6 and 7 a.m. this morning, as well.

THE COURT:  Okay.  Thank you very much.

So Mr. Ahmed, Mr. Dume, and Ms. Doyle, you are here today because you have been charged with certain crimes in an indictment, and the purpose of this proceeding is to advise you of certain rights that you have, inform you of the charges against you, consider whether counsel should be appointed for you, and decide under what conditions, if any, you may be released pending trial.

I will explain certain constitutional rights that you have:

You have the right to remain silent.  You are not required to make any statements.  Even if you have already made statements to the authorities, you do not need to make any further statements.  Any statements you do make can be used against you.

You have the right to be released, either with or without conditions, pending trial, unless I find that there are no conditions that would reasonably assure your presence at future court appearance and the safety of the community.

If you are not a U.S. citizen, you have the right to request that a government attorney or a law enforcement official notify a consular officer from your country that you have been arrested.  In some cases, a treaty or other

agreement may require the government to give that notice whether you request it or not.

You have the right to be represented by an attorney during all court proceedings, including this one, and during all questioning by the authorities. You have the right to hire your own attorney, but if you cannot afford an attorney, I will appoint one today to represent you.

Mr. Ahmed, do you understand the rights I have just explained to you, sir?

DEFENDANT AHMED: Yes, your Honor.

THE COURT: Mr. Dume, do you understand the rights I have just explained to you?

DEFENDANT DUME: Yes.

THE COURT: Okay.

And Ms. Doyle, do you understand what I have just explained?

DEFENDANT DOYLE: Yes, I do.

THE COURT: Okay, good.

And I first understand that each of you wish for me to appoint counsel. I have before me financial affidavit forms that each of you have signed under penalty of perjury. Please be aware that you can be charged with perjury for any false statements in the affidavit that each of you has signed, and if there is a change in your financial status, you do need to advise the Court. But based on the statements made in your

affidavits, I will approve the appointment of counsel for each of you.  So Mr. Marvinny will represent Mr. Ahmed; Ms. Kostopoulos will represent Mr. Dume; and, Mr. Womble, you will represent Ms. Doyle.  So thank you to each of the counsel.

So, I have before me an indictment that a grand jury of this district has returned, charging each of you with certain crimes.  These include, in Count One, from January 2025 until March 2026, in this district and elsewhere, you and others conspired to distribute and possess with intent to distribute and did distribute and possess with intent to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl and 100 grams and more of mixtures and substances containing a detectable amount of acetylfentanyl, in violation of 21 U.S.C. Sections 841(b)(1)(A), (b)(1)(B), (b)(1)(C), and 846.

And as to Mr. Ahmed and Ms. Doyle only, not as to Mr. Dume, Count Two of the indictment charges that, from January 2025 to March 2026, during the drug-trafficking crime charged in Count One, you knowingly used and carried firearms, and in furtherance of that crime possessed firearms, in violation of 18 U.S.C. Sections 924(c)(1)(A)(i) and 2.

Ms. Kostopoulos, do you know if Judge Carter referred this case for arraignments?

MS. KOSTOPOULOS:  He did, your Honor, yes.

THE COURT:  So I will ask counsel independently:

Mr. Marvinny, have you received a copy of the indictment and reviewed it with Mr. Ahmed?

MR. MARVINNY:  Yes, your Honor, and we would waive its public reading.

THE COURT:  Okay.  And is he prepared to enter a plea?

MR. MARVINNY:  Not guilty.

THE COURT:  Okay.

Ms. Kramer, same questions.  Have you reviewed -- have you received a copy of the indictment and reviewed it with Mr. Ahmed?

MS. KRAMER:  Yes, I have, your Honor.

THE COURT:  Does he waive a full public reading today?

MS. KRAMER:  Yes, he does.

THE COURT:  And is he prepared to enter a plea today?

MS. KRAMER:  Yes, not guilty, your Honor.

THE COURT:  Okay.

All right.  And same questions, Mr. Womble.

MR. WOMBLE:  Yes, your Honor.

I have provided Ms. Doyle a copy.  We have reviewed the indictment together.  We waive its public reading and enter a plea of not guilty.

THE COURT:  Okay.  Very good.  Thank you.

So the Court will enter pleas of not guilty on behalf of each of you, and the record will reflect that each of you has been arraigned.

I will hear from the government as to bail, detention, or release.

MS. KOSTOPOULOS:  Yes, your Honor.

We are seeking detention as to all three of the defendants because the presumption case, under 18 U.S.C. 3142(f)(1)(C) and (f)(2), meaning that there is no condition or combination of conditions—that is the presumption—to ensure the defendants' return, as well as the safety of the community, as well as concerns about risk of flight.

THE COURT:  Okay.  Just briefly, are each of the counsel making bail applications today?

MR. MARVINNY:  I am making an application as to Mr. Ahmed.

THE COURT:  Okay.

MS. KRAMER:  I am making an application as to Mr. Dume.

THE COURT:  Okay.

MR. WOMBLE:  And I am making an application as to Ms. Doyle.

THE COURT:  Okay.  Very good.

So if you will allow me to just kind of make some preliminary statements about the standard that I am applying,

and then I will hear from the government.  And Ms. Kostopoulos if you have kind of arguments that apply to across all three, you are welcome to do that, or if you want to go defendant by defendant, however you prefer.

But just to the individuals, the government is seeking to detain each of you pending trial in this case. Under the law, I am required to release you, either with or without conditions imposed, unless I determine that there are no conditions that will reasonably assure your appearance in court as required and the safety of the community.

In making a bail determination, I am required to consider the following factors:  The nature and circumstances of the offense charged; the weight of the evidence against you; your history and characteristics; and the nature and seriousness of the danger to any person in the community posed by your release.

In this case, the law establishes a rebuttable presumption in favor of detention.  However, this presumption is rebuttable, so the government ultimately bears the burden to establish by clear and convincing evidence that you are a danger to the community or establishing by a preponderance of the evidence that you are a flight risk.

Ms. Kostopoulos, please go ahead.

MS. KOSTOPOULOS:  Thank you, your Honor.

I will begin, first, with an overview of the case and

the --

THE COURT:  Sure.

MS. KOSTOPOULOS:  -- indictment just to provide some context for why our position is that detention is appropriate as to all three defendants, with an asterisk I will note at the end, which is specific arguments as to Mr. Dume --

THE COURT:  Okay.

MS. KOSTOPOULOS:  -- and potential future conditions that could potentially secure his return to court as well as the safety of the community.

THE COURT:  Okay.

MS. KOSTOPOULOS:  So the indictment, as your Honor is aware, charges five defendants with participating in what ultimately became over a-year-and-a-half-long conspiracy to traffic firearms and narcotics.  All of the defendants are charged as to the narcotics portion of the conspiracy, which involves a variety of extremely dangerous narcotics, including heroin, fentanyl, acetylfentanyl, which is a fentanyl analog, as well as crack cocaine and powder cocaine.

The defendants were essentially operating an open-air drugstore in the Bronx in a residential community, near a residential complex, as well as out of other locations throughout the Bronx.

The evidence in this case is extremely strong.  Law enforcement, over the course of several months, conducted a

series of controlled buys involving the majority of the defendants who were charged here, either directly or indirectly, and those controlled buys included large quantities of fentanyl, acetylfentanyl, heroin, crack cocaine, as well as, in the case of Ms. Doyle, Ms. Peralta, and Mr. Ahmed, one firearm.

The defendants -- in light of those charges, all five of the defendants are facing a ten-year mandatory minimum, given the weight of narcotics that is attributed both to the conspiracy as well as to each of the defendants individually. And for the defendants who are charged with a firearms charge, the 924(c) count, there is an additional five-year mandatory minimum.

And as I noted before, your Honor, the strength of the evidence here is quite strong. We are talking about recorded controlled purchases, law enforcement surveillance, reports prepared before and after those controlled purchases, laboratory reports, as well as text messages involving a number of members of the conspiracy where they discuss efforts to obtain additional supply, who their suppliers were, efforts to fill orders by customers, as well as the different drugs that they were attempting to procure and sell on the street.

In addition to that evidence, your Honor, so putting aside what's set forth in the indictment, earlier this morning government and the F.B.I. raided a number of residences and

stash houses associated with all five of the defendants. Those searches yielded additional contraband from which we expect additional charges are likely to follow.  Those include ammunition, a firearm that law enforcement believes to be operable, other weapons, including machetes, brass knuckles, a baseball bat covered in barbed wire, as well as narcotics that were found at all three residences.

I am going to break down the searches briefly for your Honor:

The first is the search that law enforcement conducted at an address on Carlisle Avenue that law enforcement understands that Ms. Peralta, who is still at large, and Mr. Dume, her son, resided at at least part-time. Narcotics were recovered at that residence, including empty wax envelopes, glassines, with stamps that were used by members of the conspiracy, as well as additional packages of a white powdery substance.  They haven't field tested the narcotics, but narcotics were recovered from the residence.

The second location that was raided as part of the searches was an address on Wallace Avenue where Ms. Doyle resides with her two minor children as well as, at times, we understand, her son, Mr. Ahmed, who is also a defendant in this case.  We recovered identifying documents belonging to Mr. Ahmed at the residence.  We recovered an empty holster next to those identifying documents.

We also discovered, your Honor, to be frank, a significant quantity of narcotics at that residence that were unsecured and strewn in bags on the dining room table in the kitchen as well as throughout residence.  And while those narcotics have not been field tested, we found used crack pipes, we found baggies with stamps on them, we found scales covered in powder, we found drugs in the kitchen, we found drugs in boxes and containers, I believe, in a cereal box or a coffee container in the kitchen.  And in light of that, we are seeking detention at least in part because Ms. Doyle has custody of two small children who were living at the residence with Ms. Doyle around and surrounded by unsecured narcotics.

The third residence that was searched, your Honor, as part of this investigation was a location on Commonwealth Avenue that we understand to be primarily used by the defendant's supplier and one of the dealers, Mr. Villegas. A significant quantity, again, of narcotics and contraband were recovered from that residence as well.  Law enforcement recovered pills, ammunition, other narcotics, bricks.  There were five safes in the residence.  There was a large quantity of cash.

THE COURT:  Can I just pause you for one second in terms of how you tie the Commonwealth address, the supplier, the dealer, to these defendants?

MS. KOSTOPOULOS:  There were text messages,

your Honor, involving a number of defendants, including, as relevant here, Mr. Dume, where he refers to "Mario" and discusses efforts to obtain supply.

THE COURT:  Okay.

MS. KOSTOPOULOS:  And that is part of the reason why this is charged as a conspiracy.

THE COURT:  Okay.  Thank you.

MS. KOSTOPOULOS:  And so there is significant contraband, suffice to say, recovered from Mr. Villegas's address, as well.

That bring us to the standard here in terms of the presumption of detention.

The defendants ultimately are alleged to have participated in an over year-long set that was dealing drugs and firearms essentially out in the open.  The seriousness of the offense I think can't be understated here.  We are talking about very serious, very dangerous drugs, a variety of drugs that all five of the defendants, including the three who are present today, were involved in selling or dealing or negotiating sales of.

And so there are controlled buys involving both Mr. Ahmed as well as Ms. Doyle, as well as our law enforcement surveillance, that demonstrate that Mr. Dume was also involved or at least watching several of those buys or present for them, and that he helped prepare some of the narcotics that

were ultimately served as part of those controlled purchases.

THE COURT:  And the controlled buys took place, in general, where?  On the street or near a home or near an apartment building?

MS. KOSTOPOULOS:  Both, your Honor.

THE COURT:  Okay.

MS. KOSTOPOULOS:  So some of them took place on the street, some of them took place in cars, others took place within one of the residential buildings that I have just noted.

THE COURT:  Okay.

MS. KOSTOPOULOS:  And so there are a variety of locations in which the sales take place and a variety of ways in which all five of the defendants participated in the sales or helped supply the sales in the case of Mr. Villegas.

THE COURT:  Okay.  Within one of the addresses that you just described, you are saying.

MS. KOSTOPOULOS:  Yes, your Honor.

THE COURT:  Okay.

MS. KOSTOPOULOS:  Yes.

This is extremely serious conduct, and that is not even, I think, accounting for the fact that, in addition to the narcotics conspiracy that is charged in this case, the defendants are also alleged, in the case of Ms. Doyle and Mr. Ahmed, to have participated in the sale of illegal guns

including, at least in our case, one gun that was sold after being used in a shooting in Harlem last summer. And so these are extremely, extremely dangerous narcotics and they are being combined with lethal weapons, as evidenced both by the recovery of a gun from one of the coconspirators' address, the recovery of ammunition from that address, as well as the sale of and discussion of additional firearms by the defendants.

THE COURT: I'm sorry. Just which of the addresses? I know there was a holster at the Wallace Avenue address. Which was -- which was the address where there was a firearm recovered?

MS. KOSTOPOULOS: No. So the Wallace address is Ms. Doyle's residence.

THE COURT: Okay.

MS. KOSTOPOULOS: That's where the holster was recovered --

THE COURT: Okay.

MS. KOSTOPOULOS: -- and it was found next to an identifying document belonging to Mr. Ahmed.

THE COURT: Okay.

MS. KOSTOPOULOS: The gun was recovered from Villegas's -- it's a rifle, so it doesn't fit in the holster.

THE COURT: Okay.

MS. KOSTOPOULOS: The rifle was recovered from a different address --

THE COURT:  I see.

MS. KOSTOPOULOS:  -- or a rifle, let me say, was recovered from a different address.

THE COURT:  And then the gun that you said that Mr. Ahmed and Ms. Doyle was involved in the sale of, that was what type of a handgun or a rifle?

MS. KOSTOPOULOS:  Your Honor, given that they involve controlled buys, I don't want to go --

THE COURT:  Okay.

MS. KOSTOPOULOS:  -- into detail just given that there are sources and undercovers --

THE COURT:  Okay.

MS. KOSTOPOULOS:  -- to protect, but it was a pistol.

THE COURT:  Okay.

MS. KOSTOPOULOS:  So I think now I want to turn to the history and personal characteristics --

THE COURT:  Sure.

MS. KOSTOPOULOS:  -- of each of the defendants, and I can address them each in turn.

I noted, beginning, I think, first with Ms. Doyle, not only are the charges that Ms. Doyle is facing quite serious, but there is an additional factor here that weighs heavily in favor of detention, which is that Ms. Doyle was essentially storing loose fentanyl and other drugs in her home around two teenage children.  Those drugs were found very

easily by law enforcement. I have photographs of some of them. They are essentially strewn on a coffee table or a dining room stable in Ms. Doyle's home. And that's extremely -- frankly, extremely reprehensible and dangerous conduct, that these drugs which, in even a small quantity, can be immediately lethal to minors and to small children were essentially stored unsecured in Ms. Doyle's home while her two children were living with her and while we understand Mr. Ahmed at times was living with her, as well.

I noted that Mr. Ahmed, as law enforcement understand it, lives at least part-time at the same address. I recognize that none of the defendants have a meaningful criminal history here, and that is one of the factors that weighs in favor of Pretrial's recommendation to release the defendants on some set of restrictive conditions.

I will note that, while it is not reflected in Mr. Ahmed's criminal record, our understanding from our investigation is that the NYPD arrested both Mr. Ahmed as well as Ms. Peralta earlier this October in a separate buy-and-bust investigation being coordinated by the NYPD. Mr. Ahmed and Ms. Peralta sold drugs to an undercover and were, immediately after that, arrested by members of the NYPD and additional drugs and cash were found on both Mr. Ahmed as well as Ms. Peralta at that time.

Since that time, so despite being arrested by NYPD,

despite being targeted by a buy-and-bust, our investigation has identified that Mr. Ahmed continued to deal, continued to sell, continued to attempt to procure firearms as part of this traffic -- this narcotics and firearms trafficking conspiracy. That, your Honor, demonstrates that this is not a defendant who, if he is released and permitted to return to one of his -- to a residence, even under restrictive conditions, that he is going to abide by those conditions because, frankly, he had that opportunity.  He was arrested in the midst of a buy-and-bust, and he continued, essentially unabated, to engage in precisely the same conduct.

And so that weighs very heavily in favor of detention as it relates to Mr. Ahmed, because this is an individual who was not deterred by being approached by law enforcement, was not deterred by being arrested by law enforcement, but continued essentially uninterrupted in the exact same conduct with which he is now charged and which -- and the conspiracy in which he is now charged.

Mr. Dume, as I noted, also does not have a sort of significant or meaningful criminal history, and I think that here is where I would just note an asterisk, your Honor, which is, I have had discussions with Ms. Kramer.  I recognize that Mr. Dume's counsel is going to discuss some factors that she believes weigh in favor of some kind of bail package.  I think the concern here is that, based on what I have heard in the

proposal that was provided by defense counsel, I don't think that the conditions that defense counsel has proposed or that I anticipate that defense counsel is going to outline are in fact sufficient here. And so what is missing or what is omitted from the proposed package—and I won't speak for Ms. Kramer, I will let her outline it as well, but just to identify our concerns—one, Mr. Dume does not really seem to have a stable address. It seems like he was spending part of his time living at one of the addresses that was raided today. That was the original proposal for Mr. Dume should go if he was released on bail. That is obviously a nonstarter, given that drugs were found in that residence.

In addition to that, I understand that Mr. Dume also lives part-time with a girlfriend or a romantic interest and that they have a residence. But, as I understand it, a number of other people live there, a large number of people live there. It is not necessarily his consistent residence.

And in addition to that, your Honor, and I think this is noteworthy, there is no proposal or no ability to provide any kind of meaningful or significant bond. And given that two of the defendants, including Mr. Dume's own mother is currently at large and has not surrendered despite being made aware of warrants being out for their arrest, that gives the government, I think, significant pause and concern about releasing Mr. Dume essentially on his own word. Even if other

bond -- you know, cosigners sign on moral suasion, even if some kind of home detention or home incarceration is proposed, even if some kind of location monitoring is proposed, those are not conditions that, from my perspective, under the statute are sufficient to both protect the community from Mr. Dume's extremely serious conduct as alleged in this case, as well as to ensure his return to the United -- return to Court, particularly given that, as I understand it, Mr. Dume has some ties to countries outside of the United States.

THE COURT:  Okay.

MS. KOSTOPOULOS:  So that is essentially, your Honor, I think flagging there may be a point in the future where Mr. Dume can put together a package that, you know, the government would consent to, but I don't think we are there today, and we have serious concerns about releasing Mr. Dume today based on the package that defense counsel proposed, again recognizing everything moves at warp speed after an arrest, and it may be that he would benefit from additional time to put together a more meaningful package.

THE COURT:  Okay.

MS. KOSTOPOULOS:  On that last note, your Honor, and this applies as to all of the defendants and then I will pause, each of the defendants, given their mode of operation, given that they were dealing in or around their residences and within residential complexes in the Bronx, this is one of

those cases, I think, where pretrial supervision really is just not adequate to sufficiently diminish the risk that each of these defendants will continue in the drug trafficking and gun trafficking activities with which they are charged.

There are text messages that the defendants used. They were using Cash App to make payments in connection with the scheme. They were storing narcotics and, in the case of one of the defendants, firearms in their own home. And so all of that, in combination, your Honor, demonstrates that with very -- even with onerous, stringent supervision conditions, there is really no way to ensure that the defendants will not continue to engage in the conduct even if they are released. So long as they have access to a cell phone or so long as they have access to somebody who lives in the residence who can bring narcotics or other contraband into and out of the residence, those are precisely the kinds of conditions that really no combination of conditions can ensure. And that is precisely what was happening here——they were dealing out of their houses, they were storing in their apartments or their residences, and they were dealing on the block.

All of that, in combination, your Honor, we argue demonstrates that detention is necessary here.

THE COURT:  Okay.  Thank you, Ms. Kostopoulos.

Mr. Marvinny.

MR. MARVINNY:  Thank you, your Honor.

On behalf of Mr. Ahmed, I am seeking his release on essentially the package recommended by Pretrial Services in its report who have indeed recommended release. I say essentially because Pretrial has recommended location monitoring with a curfew. We would agree to bump that condition up to home detention rather than the curfew. Of course, if the Court thought a curfew was sufficient, we would be fine with that, as well. We think Pretrial Services essentially has it just right here.

To address some of the points made by the government, first, Mr. Ahmed is not just a, you know -- he is essentially a first offender. He has one youthful offender conviction in New York State, which does not count as a conviction, so he actually has no criminal record whatsoever. That's important to note. He is 25 years old.

The government mentioned three searches of various locations, including one address where Mr. Ahmed spent some time, which we concede. However, we are proposing that he be released to a totally different address, a fourth address that has not been searched, that is not at the center or even on the edge of any allegations in this case.

To that end, your Honor, Mr. Ahmed's partner is in court today raising her hand behind me. Her name is Jaylene Jimenez. She lives in an apartment at 2334 Boston Road. They share a child together, a two-year-old child, and it is to

that address and Ms. Jimenez's care that we are proposing that Mr. Ahmed be released.

So, again, to be clear, that is none of the three addresses that were mentioned. We anticipated that there might be some concern about having Mr. Ahmed go to one of the addresses at issue, and so Ms. Jimenez is down here on very short notice after learning of his arrest and she is here to show her support.

And by the way, Pretrial recommended release even without speaking to Ms. Jimenez because at the time we didn't have her number, simply because, like many people, he didn't have it off the top of his head. It was in his phone.

THE COURT: Right.

MR. MARVINNY: We were able to contact Ms. Jimenez, and here she is.

And so we have, again, a 25-year-old with no criminal record. Pretrial recommends release. He has community support, including someone who is in court for him today.

You know, I don't minimize the seriousness of the allegations here. It sounds like a series of hand-to-hand sales. As for the alleged firearm, it sounds like the allegation is a sale. There is no allegation of use, of certainly of discharge or otherwise nefarious use in any way. There is -- I don't think there is any allegation that Mr. Ahmed or any of these defendants had any connection to any

crime that might have been involved in the gun in some prior event.

And so, again, I am not minimizing it, but, you know, this sounds like, respectfully, a kind of regular drug conspiracy charge. You know, the government said this has qualities that make it impossible to supervise. This is, again, relatively run of the mill. The fact that text messages or certain apps were involved does not preclude a defendant being released. Certainly there are conditions that the Court can impose.

And lastly, your Honor, you know, the government mentioned a recent arrest in Mr. Ahmed's -- a law enforcement contact and says he returned to engaging in the same conduct. First, we certainly deny those allegations and do not believe the Court should rely on an arrest, an arrest that, by the way, I believe has been dismissed. That's my he client's understanding, and that arrest is certainly nowhere in the Pretrial Services report, as it would be if it were an open case. So it is, in any event, not an open case.

And so, you know, for all of those reasons, your Honor, Mr. Ahmed is someone who can be released. There are conditions that can be imposed. I don't believe the government is correct that this district is incapable of supervising Mr. Ahmed. The characteristics they have discussed are present in, I dare say, nearly every drug

accusation in this district.  So supervision can be accomplished here, and it should be along the lines of what Pretrial and what we were proposing.

THE COURT:  Okay.  Is he still working for Uber Eats or has he worked there recently?

MR. MARVINNY:  He is working for Uber Eats.  Yes, your Honor.  Looking for more stable employment, but for now --

THE COURT:  And he does drive for them or is it bike?

MR. MARVINNY:  Electric bike.

THE COURT:  And how many days a week does he do that?

DEFENDANT AHMED:  I get five, whenever I got time.

THE COURT:  Okay.

MR. MARVINNY:  About three to five, your Honor.

THE COURT:  Okay.  Thank you Mr. Marvinny.

Ms. Kramer.

MS. KRAMER:  Thank you, your Honor.

So Mr. Dume also was recommended to be released by Pretrial Services on fairly limited conditions—one cosigner and not electronic monitoring, and we would propose that Mr. Dume be released with electronic monitoring.  He could provide two cosigners, your Honor.  One, his father, who has stable employment and lives in the Bronx, he is a supervisor at a construction company; and, two, his long-time partner of two years, Jasmine Hernandez.

Mr. Dume does not reside in the residence that was searched that is, as we understand it, his mother or father's address on Carlisle Avenue.  Mr. Dume has lived with Ms. Hernandez and her family in Queens for approximately two years.

Ms. Hernandez is expecting a child with Mr. Dume in a few months.  He supports his girlfriend, Ms. Hernandez, as well as his four-year-old daughter who he has with a former girlfriend.  Mr. Dume has custody of his daughter on the weekends, and it is on the weekends when he takes his daughter to visit with his mother and father who live in the Bronx address on Carlisle Avenue.

Mr. Dume does not live there.  He does not have a bedroom there.  And, you know, while perhaps more can be inferred by someone visiting an address that was searched where some amount of narcotics were found, I think it is -- there is a different picture painted when what is actually happening is that Mr. Dume is taking his child to visit with her grandparents on the weekends when he has custody of her, which is what was happening here.

Mr. Dume does not have a criminal history.  He's got no convictions.  There is something sealed in his record.  He is 26 years old and, while he doesn't have an employer, he does work.  He operates his own business installing audio systems in cars and he -- he finds customers for that business

through an Instagram and Facebook page that he has. His business is called Trendz Audio, T-R-E-N-D-Z Audio, and he has this business himself. That is how he earns a limited income that he uses to help pay rent in the apartment where he lives with his girlfriend of two years and her family, and he helps support his daughter.

There is no allegation that has been made in the indictment or that -- from the government that Mr. Dume had any involvement with any guns. He is, I believe, the only defendant who is not charged in Count Two.

And in the government's proffer of evidence, it is really not clear what Mr. Dume's role. We understand that there is no evidence that he participated directly in any of the controlled buys that took place. We understand from the government and what was just described that Mr. Dume was present for some of the buys. It is unclear what that means, your Honor, in the context of the, you know, address where some of these sales happened being the address of Mr. Dume's parents.

There is reference to text messages where Mr. Dume communicated about supply. It is not clear at all that the government's case against Mr. Dume is strong. As the Court well knows, mere presence does not make someone culpable for a narcotics transaction, and all that has been raised is that he also had some text messages. We don't know what those

messages were, how many there were, or if he played really any meaningful role at all here.

What we do know is that his residence, where he lives full-time, was not searched. Had it been searched, nothing would have been found. Mr. Dume's phone was taken this morning. He consented to the search of his phone and provided the PIN to the agents.

There are certainly conditions here, your Honor, that will reasonably assure the safety of the community and Mr. Dume's appearance. He is not proposing to reside at any address that was searched. He is proposing to continue residing with his very pregnant girlfriend of two years and her family.

And we certainly wish that there was property that could be offered to secure a bond, but Mr. Dume and his family members and those he is close with are, if not impoverished, very close to the line. The mother of his four-year-old daughter works at a school, but she is presently in the process of moving with her boyfriend and Mr. Dume's daughter from a shelter into an apartment. Everyone in his life rents their home. They don't own it. And it should not be a condition of release that a defendant does not suffer poverty or that the people around them don't suffer poverty.

THE COURT: Do you know if his girlfriend is working now?

MS. KRAMER: His girlfriend is not presently working.

THE COURT: Okay.

MS. KRAMER: She is due in just a few months.

THE COURT: Okay.

MS. KRAMER: And so Mr. Dume helps support her as well with his audio business.

THE COURT: Okay.

MS. KRAMER: You know, his father, his -- the mother of his child, and his girlfriend all could cosign a bond, and while there is not property to secure it, there is a lot of moral suasion here, your Honor, and no allegation of any dangerousness --

THE COURT: Okay.

MS. KRAMER: -- on Mr. Dume's part.

THE COURT: Okay.

MS. KRAMER: Thank you.

THE COURT: Okay. Mr. Womble.

MR. WOMBLE: Good afternoon. Thank you, your Honor.

I don't want to rehash a lot of the statements that my colleagues have already made about the case itself. However, I would say that there are conditions that would assure Ms. Doyle's return to court and her compliance with Pretrial Services.

Pretrial Services has recommended, again, a fairly standard release package. We would -- recognizing what the

government has stated and I think what we had offered up or written to the Court prior to this, we would suggest home detention, with potentially a curfew, to secure Ms. Doyle's continued compliance with Pretrial Services, drug testing, and drug treatment, if found necessary, as well.

Your Honor, my client has one prior criminal offense. It is a DWI from 2010.  That was a December 2010 DWI. Immediately after that, she immediately checked herself in, not through court mandate, but checked herself in to Rhinebeck treatment for 30 days and entered into a plea three months after her arrest.  So she has that misdemeanor on her record. But she made all her court appearances, complied fully, and then satisfied all of the myriad conditions that go along with a DWI conviction in state court—completed treatment, paid her fines, and completed everything successfully as her one kind of foray into the criminal justice system.

Today has been a harrowing experience for her, not the least of which, during the raid, her 13- and 15-year-old children were also in the apartment.  They reside with her.  I have had the opportunity to speak with two very close family friends of hers, and also her current boyfriend, who ensured that the children -- and she made sure and was able to coordinate, with the assistance and allowance the federal agents who were there, coordinated him to take them to school. I spoke with him 45 minutes ago.  He has picked them up from

school.  He has them.

But she is a single mother.  She was working for quite some time with Paul Mitchell, I think for over ten years, until 2019.  She had steady employment until 2019 with Paul Mitchell.  The reason she lost that job is because Paul Mitchell moved their operations from New York to California.

However, simultaneously, she was working another job as a home health aide for a single client who lives on Park Avenue or, I should say, lived on Park Avenue.  She was a home health aide, working for that client for 20 years, until three weeks ago when that client passed away.  She is already scheduled to be connected with another client to continue that line of work within the next approximately two to three weeks.

Other than that, she is on food stamps.  She is on a voucher for her and her children's apartment.

When they did search the apartment, my understanding is there was not any kind of stockpile of cash.  My client basically has taken care of her minor children.  I'm sorry, your Honor.

THE COURT:  What about the drugs in the residence now?

MR. WOMBLE:  Your Honor, there -- well, what I will say to that is I recognize the government's argument for certain.  I think we can all be relatively certain that at

this point there are no drugs in the residence.  I can't propose at this time, with a very limited window, that there is an alternative residence.  I know she has a boyfriend who lives across the street from her.  His day has been rather busy.  I haven't been able to confirm with him whether or not her and her children could move into that residence.  However, there are no drugs, there are no contraband, there is nothing -- if the government's recitation is accurate, there are no drugs in the residence any longer.  And this was not a residence that Ms. Doyle was at completely alone.  Codefendants were -- a codefendant was in and out of that residence as well, as referenced by the government's statements.

I recognize the government's concern about the children's safety; I do.  However, to then potentially compound that by detaining Ms. Doyle, when there are conditions, however strenuous and restrictive they need to be, that could ensure that she remains inside the residence, doesn't travel, and then with a watchful eye of Pretrial Services.

But to detain her then has her 13- and 15-year-old minor children without the only parent that is available.  Their father has been out of the picture.  Ms. Doyle was in a relationship, was married and is still technically married to this individual but has had no contact with him for the last

four years because that relationship ended and was marred with domestic violence, abuse, physical abuse, emotional abuse, and there have been orders of protection that have been -- or were put in place approximately four years ago.  I don't know if those orders of protection are still in effect, but that individual has been completely out of the picture for at least the last four years and for the better of her children and Ms. Doyle, as well.

THE COURT:  Do you know about any other family members who could take care of the children?

MR. WOMBLE:  Your Honor, she has a brother who lives in Queens.  However, I was not able to make contact with her brother.  But she does not think that her brother has the capacity to take her children in at this time.

THE COURT:  Okay.

MR. WOMBLE:  So we would obviously I recognize -- I recognize the government's -- you know, the government's pitch, obviously.

THE COURT:  Right.

MR. WOMBLE:  But, here, we think, with Pretrial's recommendation, with the fact that she has one prior misdemeanor and was fully compliant with that, that Ms. Doyle, given the opportunity to comply with Pretrial Services, she has every motivation in the world to do that and, obviously, then that would allow her to continue to be a mother to her 13- and

15-year-old moving forward.

THE COURT:  What about the amount of -- the bond you were proposing was 200,000, I think?

MR. WOMBLE:  Yes, your Honor.

THE COURT:  And who might be the cosigners on that?

MR. WOMBLE:  The cosigners, I have conferred with her two close family friends who are employed.  They would be willing cosigners.  I do think that the brother who is employed could potentially be a cosigner.  Again, in the rush of today --

THE COURT:  Sure.

MR. WOMBLE:  -- I have been able to contact three individuals that I think would potentially satisfy -- would be amenable to the government and to the Court --

THE COURT:  Okay.

MR. WOMBLE:  -- to be financially responsible cosigners, but obviously I expect that I will be able to kind of go deeper into that bench to find other possible candidates, if necessary.

THE COURT:  Okay.  Thank you.

MR. WOMBLE:  Thank you.

THE COURT:  Ms. Kostopoulos.

MS. KOSTOPOULOS:  Yes, your Honor.  Thank you.

Just briefly, I want to address each of the defendants in turn and --

THE COURT:  Yes.

MS. KOSTOPOULOS:  -- just some of the arguments that were made.

Let me begin, I think, with Ms. Doyle.  And I have two photographs here.  I can show them to defense counsel and then hand them up to the Court --

THE COURT:  Yes.

MS. KOSTOPOULOS:  -- because I think they speak to some of the concerns that the government has.  So let me do that.

THE COURT:  Yes.  You can approach when you are ready.

(Pause)

THE COURT:  Yes.  Okay.  And what am I seeing?

MS. KOSTOPOULOS:  So these are just some of the narcotics, your Honor, that were recovered from Ms. Doyle's apartment, specifically, as I understand it, the dining room table.  The first photo is the table sort of writ large, and then the second is a close-up image of the -- some of the drugs that were found on the table, which, as you can see, are just loose on the table, unsecured.

There is additional contraband on that table.  It is hard to see because the photo is black and white.  And that is not even all of the drugs that were recovered from the apartment.  So those are just the drugs that were strewn out

on the stable—clearly someone had used them or packaged them recently—unsecured, in plain view, in Ms. Doyle's apartment this morning when agents hit the door at 6 in the morning.

THE COURT:  Can you just, if you want to approach, just point to me in the picture.  Again, because it is black and white, I want to make sure that I am understanding which are the things that --

MR. WOMBLE:  Your Honor, may I approach?

THE COURT:  And if you want to approach, go ahead.

Come on up.  Go ahead.  You can come on up.  This?

MS. KOSTOPOULOS:  Yes.

THE COURT:  Okay.

MS. KOSTOPOULOS:  This is the white powder.

THE COURT:  Yes.

MS. KOSTOPOULOS:  There are empty (indiscernible) or plastic envelopes, and then these are two (indiscernible) which is --

THE COURT:  Okay.

MS. KOSTOPOULOS:  -- whatever (indiscernible).

THE COURT:  Okay.  And what is the other contraband (indiscernible)?

MS. KOSTOPOULOS:  It is not visible here, but this is just one of the places, I believe (indiscernible) plastic containers (indiscernible) and then not visible here there was a plastic bag that contained (indiscernible) files as well as

additional bags of I believe a brown (indiscernible) hidden in coffee container (indiscernible) --

THE COURT:  Okay.

MS. KOSTOPOULOS:  That is just one example.

THE COURT:  Okay.  And has the government collected what it presumes to be all of the evidence from the location or is there a further search that is going to take place?

MS. KOSTOPOULOS:  The search has concluded, your Honor.  So we have identified all of the contraband that we were able to locate within the residence.  We are fairly confident that that means that there isn't additional contraband.  But I raise this point, your Honor, to note that, in addition to the holster without a firearm that was found at this location, these were not narcotics that were hidden, that potentially were placed there by another coconspirator.  These were just out in the open, visible to law enforcement agents when they arrived in the apartment in the morning and as Ms. Doyle's children were preparing to go to school.

So that I raise primarily to note that these are precisely -- while I take Mr. Marvinny's point that there are aspects of this investigation and this case that are not unusual for drug trafficking cases, as your Honor is well aware, the presence of narcotics in a home occupied by minors, unsecured, in plain view, easily accessible by children is unusual, and that is an extremely dangerous combination of

conditions.  And it is that combination of conditions that suggests that Ms. Doyle is not likely to be amenable to supervision, just given the danger that she exposed both her children to, as well as the volume of drugs that were recovered, as well as the other evidence that I have noted.

I think a second thing that I want to flag for Ms. Doyle is that Ms. Doyle did ultimately engage in a postarrest interview——I discussed this with her counsel——and she lied to our law enforcement.  She essentially denied what I think the drugs that were recovered from her own apartment demonstrate, which is that she participated in this conspiracy.  And so the claim that Ms. Doyle is going to be candid and forthcoming with Pretrial Services, that she is going to be truthful about, you know, adhering to the conditions that are set forth by Pretrial, I recognize that the postarrest happens under certain conditions, I recognize that, you know, the fact that she was not necessarily truthful is just one data point, but I think it is a significant data point, given that the second the agents entered her apartment it was abundantly clear that there were drugs strewn throughout the apartment.

I want to turn now, I think, briefly to Mr. Ahmed.  I understand counsel's position that the fact that he has no meaningful criminal history record weighs in favor of his release in this case.  I do want to note, however, that the

arrest -- and while I recognize it is not part of his criminal history, the recovery of drugs from Mr. Ahmed and from one of his coconspirators months ago and Mr. Ahmed's continued participation in the conspiracy through this month involved in hand-to-hand, direct hand-to-hand sales of narcotics is a very significant factor that demonstrates that this was not a defendant who was deterred by being arrested, frankly, by law enforcement and having drugs seized from him and from a coconspirator.  He proceeded to directly return to the exact same conduct and the exact same conspiracy and this exact same illegal activity.

And I would note, as the indictment makes clear, that Mr. Ahmed was also one of the defendants who was charged with the 924(c) count precisely because he was involved in discussions about, as well as the sale of, a firearm.

The third defendant, your Honor, Mr. Dume, as I noted, the concern that the government has primarily here is that the package, the set of conditions that Mr. Dume's counsel is proposing that he be released on is already more lenient than the set of conditions that Pretrial is recommending.  We don't think that those conditions are sufficient here.

There was some question raised by defense counsel about the strength of the evidence against Mr. Dume.  I can give you a number of examples.

There are text messages between Dume and one of his codefendants where they discussed buying hard, quote, and soft, quote, for a client, which are references to cocaine.

They talk about whether Dume should tell, quote, Mario about the sales.  That's a reference, of course, to Mr. Villegas, their supplier, from whom a number of narcotics were recovered just this morning.

There is another text message between Dume and another coconspirator, where that coconspirator texts Dume:  I need 25 grams.  Call your people.  And Dume responds:  I got you.

So this is not a person who had an incidental role in the conspiracy.  This is not a person who had sort of an ancillary role in the conspiracy.  This is someone who was at the heart of the conspiracy and was actively involved in the activities that are alleged in the indictment.

The final thing that I will note, your Honor—and I apologize for raising this as late as I have because it is different from the representation that I made to defense counsel, but the agents reminded me as the presentment was ongoing—Mr. Dume is not charged with a 924(c) count.  The government does not allege that he was involved in the sale of the firearm that is the basis for the 924(c) count or discussions about additional firearms which are also the basis for the 924(c) count.  However, the government has recovered

at least one photograph of a masked individual posing with a pistol or a handgun that the government believes to be Mr. Dume.

And so I raise that, your Honor, to note, notwithstanding that fact, our position is still that Mr. Dume should be detained, but the suggestion that Mr. Dume is somehow outside of or at the very fringes of this conspiracy is just not accurate based on the text messages and the other evidence, as well as this photograph. I don't have a copy of it to show your Honor. The individual is masked. But based on their characteristics, as well as their build, our understanding is that it is a photograph of Mr. Dume posing with a firearm.

And I should note we can't tell from the photograph whether it is a real firearm or not. Sometimes we can, sometimes we can't. But I add that as, I think, an additional fact here that ultimately I think is outweighed by the weakness of the bail package that Mr. Dume and his counsel are proposing here.

THE COURT: Okay. Thank you.

Just give me a minute.

(Pause)

THE COURT: All right. So going in reverse order, with respect to Ms. Doyle, I have spoken to Pretrial Services about potentially doing a home visit as soon as possible. And

so what I am proposing is that we put Ms. Doyle over.  You will be detained today, but we are going to put your case over until Friday.  You will be back before me on Friday.  I am going to ask Pretrial Services to do their best to do a home visit of Ms. Doyle's residence between now and then.  And then, based on the results of that, as well as that will give you a chance, Mr. Womble, any additional information you could share with me about either possible alternative residences if Pretrial were to find that that residence is not suitable, as well as more information about a possible reemployment for Ms. Doyle, as well as other family members who might be able to take care of the children.  I am obviously concerned about that, and to me there is some -- because of the children there is a little bit more time sensitivity.  So I have asked Pretrial to prioritize a home visit for Ms. Doyle between now and Friday, and we will put the case over until then.

With respect to Mr. Dume, I am also going to ask -- I am going to describe the set of conditions on which I think you can be released, Mr. Ahmed -- I'm sorry, Mr. Dume.  You are not going to be released today because there are certain of these conditions that I want to be satisfied before you are released, including a home visit of the Queens residence by Pretrial Services, but they may not be able to do that between now and Friday.

So I am going to set the following conditions, and so

they are that you must post a bond in the amount of $75,000 cosigned by two financially responsible persons.  And so both you and the financially responsible persons need to cosign the bond before you can be released.

I am, like I said, going to ask Pretrial to do a home visit and provide me with a report of that.  So this is obviously subject to getting that report, as well, of the Queens residence.  But based on what's been described to me, it sounds like I am relatively optimistic and hopeful, but obviously I will leave it to Pretrial's discretion whether that residence is suitable for you.

You will be placed on home detention with location monitoring.

You will be subject to Pretrial Services's supervision as directed.

You must surrender any travel documents and make no new applications for travel documents.  Your travel is going to be restricted to the Southern and Eastern Districts of New York.

You must continue or obtain employment.

You may not have any contact with any of the codefendants in this case.

I will also direct that you undergo urinalysis and drug testing and treatment, as appropriate -- as deemed appropriate by Pretrial Services.

And, also, as set forth in the Pretrial Services report, you must refrain from using any narcotic drugs unless prescribed by a medical provider.

And then following your release, we will schedule a check-in call, and I will conduct regular periodic calls with you to see how you are doing on the conditions that I have set.

So, again, you are not going to be released today, but these are the conditions that I have set. We will get a report from Pretrial Services as soon as they are able to do the home visit and then, once the bond has been signed by Mr. Dume, as well as the two financially responsible persons, then we will allow that he can be released.

With respect to Mr. Ahmed, I am going to order that you be detained today because I find that the government has met its burden of establishing that there are no conditions that I can impose that will reasonably assure your appearance and the safety of the community while this case is going forward. I have made this decision based on all of the information that's been presented to me, including the Pretrial Services report and the arguments and information provided by counsel and considering all of the factors set forth in 3142(g).

As we heard at the outset, given the nature of the charges in this case, there is a rebuttable presumption in

favor of detention.  Primarily I am concerned about the safety of the community and the evidence as it's been presented to me here so far today.  As your counsel has presented the evidence here so far today has not rebutted that presumption.

I think there is a serious risk both in terms of the narcotics as well as the apparent drug sale in which you were involved that your continued freedom would endanger the safety of the community, and the government has shown me by clear and convincing evidence that there are no conditions that would reasonably assure the safety of the community while your case is going forward.

I have considered the nature and circumstance of the offense charged against you as well as the evidence as it's been proffered here by the government today.  It appears to be very strong.  While I acknowledge, as your counsel said, that you have really just, in terms of prior convictions, just youthful offenses, which I am not considering.  I am concerned about the recent arrest.  I know you have denied that.  But I take the government at its representation that that arrest occurred, and it concerns me that it appears that you continued to engage in similar activity notwithstanding that arrest.  So even if nobody told you when you were arrested in October that you should stop selling drugs, that should have been obvious.

The fact that you were involved in the types of --

sales of the types of drugs that are alleged here as well as a firearm are extremely concerning to me about the safety of the community.

I have considered the conditions that Mr. Marvinny proposed, and I don't think, frankly, that, given the nature of the behavior that's been described here to me, that there is either -- is a residence that has been proposed to me that would be safe for you to live in or that you would refrain from the activity that you are alleged to be involved in in the meantime. So I am not confident that we could keep you on the straight and narrow or that you would follow my instructions or the instructions of Pretrial Services.

So I am going towards that Mr. Ahmed be detained today.

So, Ms. Kostopoulos, if we were to put Ms. Doyle's case over until Friday at 2:00, does that work for you?

MS. KOSTOPOULOS:  It does, your Honor.

THE COURT:  Mr. Womble.

MR. WOMBLE:  It works for the defense.

THE COURT:  Okay.

MR. WOMBLE:  Thank you.

A VOICE:  (Indiscernible).

THE COURT:  Okay.

A VOICE:  Pretrial Services (indiscernible).

THE COURT:  Okay.

A VOICE:  (Indiscernible).

THE COURT:  Okay.  I will make sure that counsel or whoever has that contact information will give that to you before they leave here today.  Okay.  Thank you for pointing that out.

Ms. Kostopoulos, has Judge Carter set any proceedings in this case?

MS. KOSTOPOULOS:  He has, your Honor.  Subject to all of counsel's confirmation, he has scheduled a pretrial conference for Tuesday, March 31, at noon.

THE COURT:  Noon you said?  Okay.  All right.

Mr. Marvinny, are there any medical conditions we should note.

MR. MARVINNY:  No, your Honor.

THE COURT:  Okay.  Anything further, then, Mr. Marvinny?

MR. MARVINNY:  No.  I mean, I am -- I understand the Court's ruling.  I don't -- it's a little surprising to me.  I mean, the evidence against Mr. Ahmed is equivalent or less than some of the defendants who may get released.  But I guess that may be the -- a matter for an appeal, so nothing further.

THE COURT:  Okay.

Ms. Kramer, anything further?

MS. KRAMER:  Your Honor, I would just ask that the Court also appoint my co-counsel on the CJA panel --

THE COURT:  Yes.

MS. KRAMER:  -- Arlo Devlin-Brown, who is here today.

THE COURT:  Hi.  Good afternoon.

Yes.  We can note him on the financial affidavit, as well.

MS. KRAMER:  Thank you, your Honor.

THE COURT:  If there is another place we should do that, just let me know, but otherwise we will put his name on that.

MS. KRAMER:  Thank you, your Honor.

THE COURT:  Mr. Womble.

MR. WOMBLE:  No, your Honor.  Just confirming Friday at 2:00.

THE COURT:  Friday at 2:00, and we will be here.

MR. WOMBLE:  And I will make certain to follow up with contact information --

THE COURT:  Exactly.

MR. WOMBLE:  -- with Pretrial Services.  Thank you.

THE COURT:  Yes.  Thank you.

Thank you very much, everyone.  We will be --

MS. KOSTOPOULOS:  Your Honor --

THE COURT:  -- adjourned.

MS. KOSTOPOULOS:  -- I apologize.  Before we are adjourned, just two or three questions.

The first is, I understand that we are going to be

here appearing again on Friday for Ms. Doyle.

THE COURT:  Yes.

MS. KOSTOPOULOS:  For Mr. Dume, is there going to be some kind of control date or status conference or is the expectation that, assuming the home visit is satisfactory, the parties will be notified, and then Mr. Dume will be released upon satisfaction of the conditions?

THE COURT:  Yes.  So he and the two cosigners need to sign their bond.  So I think you will know that before I do.  And then I have asked Pretrial to give me a report of the home visit.  So I assume we will get that and counsel will be copied on it.  And then once -- if that all checks out, then we will notify counsel -- notify everybody whether his release has been approved.

MS. KOSTOPOULOS:  Okay.

And my second question, your Honor, for Mr. Dume and Ms. Doyle, to the extent that they are scheduled to be released subject to the findings of both home visits, we would just ask for two additional conditions for the Court to consider --

THE COURT:  Okay.

MS. KOSTOPOULOS:  -- some of which I think are outlined in the pretrial report.

THE COURT:  Yes.

MS. KOSTOPOULOS:  The first is just that they be

prohibited from possessing a firearm, destructive device, or other dangerous weapon; and the second would be -- I think that there was a prohibition on consuming drugs, but we would just ask that they also be required to submit to an additional drug test and, if positive, that drug testing and treatment as directed be required.

THE COURT:  I said both of those things as to Mr. Dume, and I just didn't go into detail as to Ms. Doyle because we don't know what's going to happen on Friday.

MS. KOSTOPOULOS:  Right.  I just wanted to confirm (indiscernible) --

THE COURT:  I totally understand.

MS. KOSTOPOULOS:  -- understand the conditions.

And then I think the only housekeeping matter, your Honor, is just to request the exclusion of time between now and March 31, in order to give the parties an opportunity to begin discussing the disclosure of discovery as well as to negotiate a protective order.

THE COURT:  Okay.  Mr. Marvinny, do you wish to be heard?

MR. MARVINNY:  No objection.

THE COURT:  Okay.

Ms. Kramer?

MS. KRAMER:  No objection, your Honor.

MR. WOMBLE:  No objection.

THE COURT:  Okay.  So we will exclude time between now and March 31 because we find that the ends of justice outweigh the interests of the public and the defendants in a speedy trial based on the need to begin exchanging discovery and negotiate a protective order.  So time is excluded through March 31 and the proceeding in front of Judge Carter.

Okay.  Anything further, then?  That's it?

MS. KOSTOPOULOS:  Yes, your Honor.

THE COURT:  Sorry.  I didn't mean to rush you.

Okay.  Thank you very much, everyone.  We will be adjourned.  Have a good afternoon.

(Adjourned)

C E R T I F I C A T E


    I, Kristen J. Carannante, certify that the

transcript of the digital audio recording of the

proceedings in the above-entitled matter is a true

and accurate transcription.




Signature    /s/ *Kristen J. Carannante*
             KRISTEN J. CARANNANTE, RPR, RMR, FCRR
             (848) 459-3124
             kjcarannante@gmail.com


Date:        March 19, 2026